UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FINISAR CORPORATION,

                Plaintiff,                        CIVIL ACTION NO. 2:11-cv-15625

v.                                                Honorable District Judge Paul D. Borman

CHEETAH OMNI, LLC,

                Defendant.

_____

**FINISAR CORPORATION'S MOTION FOR INJUNCTION OF CHEETAH OMNI, LLC'S CO-PENDING CLAIMS AGAINST FINISAR'S CUSTOMERS AND FOR A LEAVE TO FILE A SUMMARY JUDGMENT MOTION**

Plaintiff Finisar Corporation ("Finisar") hereby respectfully moves that this Court enjoin Defendant Cheetah Omni, LLC's ("Cheetah") co-pending claims of infringement of US Patent Nos. 6,888,661 (the "'661 Patent") and 6,847,479 (the "'479 Patent") implicating Finisar's products against Finisar's customers in the Eastern District of Texas, Civil Action Nos. 6:11-cv-00390, and grant Finisar leave to file a motion for summary judgment of non-infringement.

Pursuant to Local Rule 7.1(a), counsel for Finisar sought concurrence in the relief requested in this motion in a phone conference, but counsel for Cheetah declined to concur.

DATED:  February 24, 2012                    Respectfully submitted,

                                             s/A. Michael Palizzi
                                             A. Michael Palizzi (P47262)
                                             MILLER, CANFIELD, PADDOCK & STONE, PLC
                                             150 W. Jefferson, Ste. 2500
                                             Detroit, MI  48226
                                             Telephone: (313) 963-6420
                                             palizzi@millercanfield.com

                                             s/David Radulescu
                                             David Radulescu
                                             davidradulescu@quinnemanuel.com
                                             Tigran Vardanian
                                             tigranvardanian@quinnemanuel.com
                                             QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                             51 Madison Avenue, 22nd Floor
                                             New York, NY  10010-1601
                                             (212) 849-7000

                                             *Attorneys for Plaintiff Finisar Corporation*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FINISAR CORPORATION,

                Plaintiff,                         CIVIL ACTION NO. 2:11-cv-15625

v.                                        Honorable District Judge Paul D. Borman

CHEETAH OMNI, LLC,

                Defendant.

_____

**BRIEF IN SUPPORT OF FINISAR CORPORATION'S MOTION FOR INJUNCTION
OF CHEETAH OMNI, LLC'S CO-PENDING CLAIMS AGAINST FINISAR'S
CUSTOMERS AND FOR A LEAVE TO FILE
A SUMMARY JUDGMENT MOTION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ................................................................................................2

    1.     The Parties ................................................................................................2

    2.     Cheetah's Four Prior Suits Against Finisar's Customers ........................3

    3.     The Four (4) Patents-in-Suit ...................................................................5

III.   ARGUMENT .....................................................................................................6

    1.     Cheetah Should Be Enjoined from Prosecuting Any Claims Arising out of the Patents-in-Suit against Finisar's Customers under the Customer Suit Exception ...............................................................................................6

        A.     The Customer Suit Exception Applies to this Case ....................7

        B.     An Injunction of the Customer Suit Is Warranted ....................10

    2.     The Court Should Allow Finisar to File a Summary Judgment Motion of Non-Infringement ..................................................................................12

        A.     Finisar's Optical Switches Do Not Infringe the '661 Asserted Claims Because They Lack a "Plurality of Cavities" ................14

        B.     Finisar's Optical Switches Do Not Infringe the VBG Patents Because They Lack a "Variable Blazed Grating" ....................14

IV.    CONCLUSION.................................................................................................17

## TABLE OF AUTHORITIES

**Page**

### Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)........................................................13

*Codex Corp. v. Milgo Elec. Corp.*,
553 F.2d 735 (1st Cir. 1977).................................................................................................6

*Cybor Corp. v. FAS Techs., Inc.*,
138 F.3d 1448 (Fed. Cir. 1998)..........................................................................................11

*Delphi Corp. v. Automotive Techs. Int'l, Inc.*,
No. 08-CV-11048, 2008 WL 2941116 (E.D. Mich. Nov. 25, 2008)...........................6, 7, 8, 9

*Kahn v. General Motors Corp.*,
889 F.2d 1078 (Fed. Cir. 1989)........................................................................................5, 7

*Katz v. Lear Siegler, Inc.*,
909 F.2d 1459 (Fed. Cir. 1990)..........................................................................6, 9, 10, 11

*My-Mail, Ltd. v. Am. Online, Inc.*,
476 F.3d 1372 (Fed. Cir. 2007)..........................................................................................12

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)......................................................................................13, 14

*Probatter Sports, LLC v. Joyner Techs., Inc.*,
463 F. Supp. 2d 949 (N.D. Iowa 2006).............................................................................11

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002)...............................................................................12, 13, 15

*Schoenhaus v. Genesco, Inc.*,
440 F.3d 1354 (Fed. Cir. 2006)..........................................................................................12

*Sortex Company of North America v. Mandrel Indus.*,
226 F. Supp. 995 (W.D. Mich. 1964) ................................................................................11

*Tegic Commc'ns Corp. v. Bd. of Regents of Univ. of Tex. Sys.*,
458 F.3d 1335 (Fed. Cir. 2006)............................................................................................6

### Other Authorities

Patent Case Management Judicial Guide (2009), §2.1.1.4 ........................................................12

ii

I.      **INTRODUCTION**

Finisar Corporation ("Finisar") is a leading provider of optical subsystems, modules and components used by such companies as IBM, Hewlett-Packard and Cisco-Systems.  The product at issue in this action is a type of an optical switch called a Wavelength Selective Switch ("WSS"), which is used in fiber optics communications networks (*e.g.*, Verizon FIOS cable services).

Finisar brought this declaratory judgment action because Cheetah Omni, LLC ("Cheetah"), a company that owns patents but does not manufacture any products, has been aggressively pursuing Finisar's customers through numerous lawsuits, asserting infringement of its patents by devices that incorporate Finisar's optical switches.

As explained further below, this Court should enjoin Cheetah from pursuing Finisar's customers in a suit pending in the Eastern District of Texas pursuant to the well-established "customer suit exception" favoring direct, single suits between patentee and manufacturer (over indirect, piece-meal suits with diverse customers).  Cheetah has not asserted its patents against Finisar directly, presumably because Finisar, as the manufacturer of the accused optical switches, is in a much better position and has a greater incentive to defend against Cheetah's allegations. Indeed, even though Cheetah recently had an opportunity to add Finisar to the Texas Action, it did not do so.  This case, unlike the Texas Action, will resolve Cheetah's claims globally, with respect to Finisar directly as well as all of its customers, including the subset named in the Texas Action.  This is precisely the circumstance warranting an injunction under the customer suit exception.  Thus, Cheetah's claims against Finisar's customers in the Texas Action should be enjoined, and adjudicated by this Court, whose determination would have a global effect.

1

In addition, this entire case can be disposed of now by the Court deciding two simple and straightforward questions of law involving the interpretation of two key claim limitations. Cheetah's claims of infringement are predicated on broad – and erroneous – interpretations of these limitations. In particular, for the first limitation, Cheetah has to argue that an express definition in the patent itself (*i.e.*, "As used throughout this document the term "optical cavity" refers [to] . . . ") should be **ignored**. For the second limitation (where no express definition for "variable blazed grating" is provided), Cheetah has to argue that the ordinary and customary meaning of that limitation should be **ignored**. These are purely claim construction arguments that can be resolved now on summary judgment. Once properly construed based on well-established principles of claim construction law, there is no genuine issue of material fact precluding summary judgment. As such, this would put a global end to Cheetah's claims of infringement against Finisar's optical switches, saving judicial resources and preventing expensive and unnecessary discovery. For that reason, Finisar also seeks leave to file a motion for summary judgment of non-infringement.

## II.   BACKGROUND

### 1.   The Parties

Finisar is a leading provider of optical subsystems, modules and components that are used to interconnect network equipment. Finisar sells its optical products to manufacturers of storage systems, networking equipment and telecommunications equipment, such as Alcatel-Lucent, Cisco Systems, Hewlett-Packard, IBM, Nokia-Siemens, Fujitsu and Tellabs. These customers, in turn, sell their systems to other businesses, such as cable and wireless telecommunications service providers and cable TV operators.

Cheetah is a limited liability company based in Ann Arbor, Michigan. Cheetah was founded by Mohammed N. Islam, a professor at the University of Michigan. Cheetah is an

2

assignee of a number of patents on which Professor Islam is named as an inventor.  To Finisar's

knowledge, Cheetah does not manufacture any products, and instead vehemently asserts patent

infringement claims through litigation.  In the past six years, Cheetah has asserted its patents in

at least 15 actions in various federal courts.

### 2. Cheetah's Four Prior Suits Against Finisar's Customers

Cheetah has a pattern of pursuing customers of Finisar through patent litigation, at the

same time avoiding direct confrontation with Finisar.

Cheetah's first lawsuit against a Finisar customer, Verizon Communications, Inc., was

filed in June 2009 in the Eastern District of Texas, Civil Action No. 6:09-cv-260 (the "Verizon

Action").  The Verizon Action settled in October 2011.  Although the case involved different

patents and different claims, the accused products included the same Finisar optical switches

(although different technical features).  In the course of discovery in the Verizon Action, Cheetah

subpoenaed Finisar and gained access to Finisar's documents describing the design and operation

of Finisar's optical switches.  Cheetah also deposed Finisar regarding Finisar's optical switches.

As a result, Cheetah is in possession and has knowledge of the design and operation of Finisar's

optical switches.

On June 3, 2011, Cheetah filed separate patent infringement actions against Fujitsu

Network Communications, Inc. ("Fujitsu") and Tellabs, Inc., Tellabs Operations, Inc., and

Tellabs North America, Inc. (collectively, "Tellabs"), Civil Action Nos. 2:11-cv-12427 and 2:11-

cv-12429, in this Court.  Fujitsu and Tellabs are also Finisar customers, and at least one of these

lawsuits implicated Finisar's optical switches.  However, after Judges Steeh and Roberts,

respectively, were assigned to the cases, Cheetah voluntarily dismissed the cases, and on the

same day filed the currently pending action against Fujitsu, Tellabs, as well as Alcatel-Lucent

Holdings, Inc., Alcatel-Lucent USA Inc., Ciena Communications, Inc., Ciena Corporation,

Nokia Siemens Networks US LLC, and Futurewei Technologies, Inc. in the Eastern District of Texas, Civil Action Nos. 6:11-cv-00390. All the defendants named in the Texas Action are customers of Finisar.

Cheetah asserted seven patents in the Texas Action. Only two of those patents, US Patent Nos. 6,888,661 (the "'661 Patent") and 6,847,479 (the "'479 Patent"), implicate Finisar's optical switches. Indeed, the bulk of Cheetah's infringement allegations in the Texas Action is directed to optical devices of Finisar's competitors, which are designed and operate in a manner substantially different from Finisar's optical switches and are also much closer to the claimed inventions. The addition of products using Finisar's optical switches to the Texas Action is puzzling, given the contrast between Finisar's optical switches and both the asserted claims and the accused competitor's products.

The Texas Action has not progressed far since its filing. The court set a schedule, with a close of discovery in September 2013, and a trial to commence in March 2014 (*i.e.*, 30 months from filing). The court also required Cheetah to join parties by February 1, 2012. Even though by that date this action had already been pending, Cheetah chose not to add Finisar to the Texas Action, confirming again its preference to avoid direct confrontation with Finisar and rather pursue only Finisar's customers.

After Cheetah's pattern of pursuing Finisar's customers became evident with the filing of the Texas Action, Finisar initiated the present declaratory judgment action on December 23, 2011 (the "Michigan Action"), with the objective to confront Cheetah directly and obtain a judgment that would prevent any further piecemeal litigation by Cheetah against individual Finisar customers.

3.      **The Four (4) Patents-in-Suit**

The technology at issue in this case relates to features of optical processing devices that can be found in, for example, fiber optic network systems that handle the massive data traffic generated by computers, smartphones, tablets and other networked devices.  Nowadays, such data is commonly transmitted by optical signals (light beams) of various wavelengths through optic fibers.

Out of the four Cheetah patents-in-suit, two – the '661 and '479 Patents – are asserted against Finisar's customers in the Texas Action.  The other two patents – US Patent Nos. 6,445,502 (the "'502 Patent") and 6,721,473 (the "'473 Patent") – are related to the '479 Patent and are directed to the same feature of an optical device, the variable blazed grating ("VBG"). These three related patents are herein collectively referred to as the "VBG Patents" and analyzed together.

Cheetah has asserted the following claims of the '661 Patent implicating Finisar's optical switches against Finisar's customers in the Texas Action: 1-2, 6-7, 11, 15, 25-27, 29-31, 48-49, 50, 52 and 55 (the "'661 Asserted Claims").  Each '661 Asserted Claim includes a "plurality of cavities" limitation.  In order to show infringement of any of the '661 Asserted Claims, Cheetah must establish that an accused product has a "plurality of cavities."

Cheetah has asserted the following claims of the '479 Patent implicating Finisar's optical switches against Finisar's customers in the Texas Action (the other two VBG Patents have not been asserted in the Texas Action): 13-15, 17-18, 20, 23, and 25-27 (the "'479 Asserted Claims").  Each '479 Asserted Claim as well as each claim of the '473 and '502 Patent includes the "variable blazed grating" limitation or equivalent language.  In order to show infringement of any of the VBG Patents, Cheetah must establish that an accused product has a "variable blazed grating," or an equivalent (*i.e.*, "reflective mirror strips" "operable to undergo a partial rotation"

5

"resulting in a diffraction of the input optical signal wherein a majority of the diffracted input signal is communicated in one direction" for any claim of the '502 Patent).

## III.   ARGUMENT

### 1.   Cheetah Should Be Enjoined from Prosecuting Any Claims Arising out of the Patents-in-Suit against Finisar's Customers under the Customer Suit Exception

The doctrine for favoring a later-filed manufacturer suit over an earlier-filed customer suit is known as the "customer suit exception." *See, e.g., Kahn v. General Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989). It is called an "exception" because it overrides the general principle favoring earlier-filed actions over later ones. *Id.*

The customer suit exception acknowledges the fact that the manufacturer will typically have stronger incentives than its customers to advocate zealously concerning the alleged patent infringement. *See id.* ("The customer suit exception is based on the manufacturer's presumed greater interest in defending its actions against charges of patent infringement; and to guard against possibility of abuse"); *Katz v. Lear Siegler, Inc.,* 909 F.2d 1459, 1464 (Fed. Cir. 1990) ("[I]t is a simple fact of life that a manufacturer must protect its customers, either as a matter of contract, or good business, in order to avoid the damaging impact of an adverse ruling against its products"); *Codex Corp. v. Milgo Elec. Corp.,* 553 F.2d 735, 737-38 (1st Cir. 1977) ("At the root of the preference for a manufacturer's declaratory judgment action is the recognition that, in reality, the manufacturer is the true defendant in the customer suit"). As a corollary, a customer that did not have final responsibility for designing, developing or manufacturing a component of its ultimate product would have less incentive to vigorously defend the component against patent suits, particularly if the component is interchangeable and could be replaced with a competitor's product that is not entangled in a patent dispute. *Delphi Corp. v. Automotive Techs. Int'l, Inc.*, No. 08-CV-11048, 2008 WL 2941116 at *4 (E.D. Mich. Nov. 25, 2008).

6

A manufacturer's declaratory judgment action is also favored because it can significantly streamline and possibly render moot the legal issues in related customer suits. *See Katz*, 909 F.2d at 1464 ("Although there may be additional issues [in the customer suits], their prosecution will be advanced if [the plaintiff] is successful on the major premises being litigated in [the primary infringement suit], and may well be mooted if he is unsuccessful."); *Tegic Commc'ns Corp. v. Bd. of Regents of Univ. of Tex. Sys.*, 458 F.3d 1335, 1343 (Fed. Cir. 2006) ("[T]he guiding principles in the customer suit exception cases are efficiency and judicial economy.").

Another situation where adjudication of a later-filed suit is favored over the earlier-filed suit is where forum shopping motivated the patent holder's choice of the venue. *See Kahn*, 889 F.2d at 1081; *see also Delphi*, 2008 WL 2941116 at *4-5 ("Courts may dispense with the ["first-to-file"] rule for equitable reasons or when special circumstances are present, including bad faith, anticipatory suits, forum shopping or significant policy considerations").

The customer suit and forum shopping exceptions justify suspending the earlier-filed claims against customers, so that those claims can be adjudicated more fully in the later-filed manufacturer suit. *See Kahn,* 889 F.2d at 1080. Such a suspension can be put in place by a stay entered in the earlier-filed case or by an injunction of the earlier-filed claims entered in the later-filed manufacturer's suit. *Id.* In fact, the Federal Circuit has held that "[t]here is no functional distinction between a stay of the first-filed suit and an injunction against prosecution of the first-filed suit." *Id.*

### A.    The Customer Suit Exception Applies to this Case

The rationale of the customer exception suit applies well here, just like it did in *Delphi*, a fairly recent Eastern District of Michigan case before Judge Cleland, with strikingly similar facts. *Delphi*, 2008 WL 2941116.

7

In *Delphi*, a patent holder, ATI, sued several car manufacturers in the Eastern District of

Texas alleging that the Passive Occupant Detection System ("PODS") incorporated in their cars

infringed ATI's patents. *Id.* at *1. The manufacturer of PODS was Delphi Corporation

("Delphi"), but ATI did not name it as a defendant in the Texas action. *Id.* Shortly after the

Texas suit was filed, Delphi initiated a declaratory judgment action against ATI in this Court, at

which point ATI moved to dismiss the Michigan case under the first-to-file rule and, in the

alternative, for a transfer to the earlier-filed case or a stay. *Id.* This Court denied the motions for

dismissal, transfer, and stay, holding that the customer-suit exception prevented such relief.

Specifically, Judge Cleland provided the following rationale in his opinion:

> ATI as patent holder is the natural plaintiff, but the Texas litigation is
> piecemeal to the extent that those defendants relied upon Delphi as the
> source of an allegedly infringing product. Delphi as manufacturer is the
> natural defendant, because any resolution vis-a-vis Delphi would be global
> as far as its PODS customers and, for that matter, ATI would be
> concerned. Further, Delphi as manufacturer controlled the design and
> production and therefore is in the best position to defend its own products.
> As a matter of judicial economy, global settlement is preferred over
> piecemeal litigation. Moreover, the only apparent connection to the
> Eastern District of Texas is an unspecified general allegation that "each
> Defendant has transacted business in this district or has committed and/or
> induced acts of patent infringement in this district." It stands to reason
> that if such business and acts are limited to vehicle sales, then any federal
> district court in America would have the same connection to ATI's Texas
> case. As such, the court believes that special circumstances, including the
> possibility of forum-shopping, militate against following the first-to-file
> rule here, particularly when only about one month separates the filing of
> the two complaints.

*Id.* at *5 (internal citations omitted). Delphi did not move for an injunction in that case, and in

fact both parties indicated readiness to litigate the Texas and Michigan cases separately and

simultaneously, which the Court approved with some reluctance, making clear that "a global

case is the more sensible approach." *Id.* at *6.

This Court's rationale in *Delphi* applies with full force here, down to each factual nuance.

8

Putting aside that both customer suits were filed in the Eastern District of Texas (although it is not a mere coincidence: the Texas court is known for being the venue of choice of non-practicing patent-holders), the Texas Action is a piecemeal adjudication, given that neither Finisar nor other Finisar customers using Finisar's optical switches have been named as defendants in the Texas Action.

Just like Delphi, Finisar is the manufacturer of the primary device accused of infringing the '661 and '479 Patents. Therefore, Finisar is the natural defendant, and a resolution of Cheetah's claims of infringement of the '661 and '479 Patents vis-à-vis Finisar would be global as far as **all** customers of Finisar's optical switches are concerned and not just the subset named in the Texas Action.

Finisar is in the best position to defend its accused products because as the manufacturer it controls their design and production. Indeed, Cheetah has already subpoenaed Finisar, seeking information about the design and operation of Finisar's optical switches for the purposes of the Texas Action, which shows the significance of Finisar and its information for the Texas Action.

Just like in *Delphi*, the products at issue in the Texas Action are not connected to the Eastern District of Texas beyond being possibly sold or used there. Finisar does not design or manufacture its optical switches in the Eastern District of Texas. On the other hand, Cheetah's founder and the named inventor of the patents-in-suit lives and works in the Eastern District of Michigan, so the connection to this Court is more significant.

In addition, there is actually more potential for forum shopping here than in *Delphi*. As discussed above, Cheetah first filed two cases in this Court, one against Fujitsu, the other against Tellabs, asserting three of the seven patents currently at issue in the Texas Action. Less than two

9

months later, Cheetah voluntarily dismissed the cases here and on the very same day filed the Texas Action.

Thus, for all the reasons this Court decided to apply the customer suit exception in the *Delphi* case, the Court should do so here as well.

### B.    An Injunction of the Customer Suit Is Warranted

An injunction of an earlier filed customer suit is available to a manufacturer in a subsequent suit when a customer suit exception applies. *See Katz*, 909 F.2d at 1463. The standard for granting an injunction in a customer suit exception context is entirely different from the traditional injunction standard requiring a showing of irreparable harm and a likelihood of success on the merits, as the Federal Circuit explained in *Katz*. *Id.* at 1462-3.

The facts in *Katz* are similar to the facts in this case. In *Katz*, the plaintiff filed a patent infringement suit against customers of Smith & Wesson Corporation ("Smith & Wesson") – Batavia Marine & Sporting Supplies, Inc. and Gun Center, Inc. – in the Western District of New York ("Batavia action"). *Id.* at 1461-2. Smith & Wesson sought declaratory judgment in the Western District of Massachusetts and also moved for injunction of the plaintiff's claims against its customers in the Batavia action. *Id.* at 1462. The district court applied the customer suit exception and granted the injunction. *Id.* The Federal Circuit held that the standard the district court applied was proper for injunctions in the customer suit exception context, stating that:

> we agree with the district court that this [traditional] standard [requiring a showing of irreparable harm and a likelihood of success on the merits], which was developed to test the grant of the requested remedy before the case has been tried on the merits, does not apply to the different question of whether to enjoin the prosecution of concurrent litigation. In the latter case it is not controlling whether the plaintiff is likely to succeed on the merits. Instead, ***a primary question is whether the issues and parties are such that the disposition of one case would be dispositive of the other***.

10

*Id.* at 1462-3 (emphasis added).  Despite the fact that the defendants in the customer suit did not agree to be bound by the decision in the Massachusetts action and the fact that there were other issues pending in the customer suit that would not be resolved by Smith & Wesson's declaratory judgment action, the Federal Circuit affirmed the injunction because the major issues of non-infringement and invalidity of the patents that were common between the two lawsuits would be globally resolved for Smith & Wesson's customers in the manufacturer's suit.  *Id.* at 1464.

Thus, under *Katz*, an injunction in the context of the customer suit exception does not require that the movant meet an additional burden.  The analysis of both the customer suit exception and the injunction available under the exception focuses on whether the second-filed manufacturer's suit can globally resolve claims asserted against customers in the earlier-filed case.

*Katz* was recently followed in a Northern District of Iowa case.  *Probatter Sports, LLC v. Joyner Techs., Inc.*, 463 F. Supp. 2d 949, 955-7 (N.D. Iowa 2006) ("The case at bar is indistinguishable from *Katz*").  The *Probatter* court clarified that the Federal Circuit law, *i.e.*, *Katz*, governed the standard for injunctions in the context of the customer suit exception.  *Id.* at 954 ("injunctions arbitrating between co-pending patent declaratory judgment and infringement cases in different district courts are reviewed under the law of the Federal Circuit").

Injunctions in the context of the customer suit exception, while rarely raised, have been granted by Michigan courts as well.  *See, e.g., Sortex Company of North America v. Mandrel Indus.*, 226 F.Supp. 995 (W.D. Mich. 1964).

For the same reasons why the customer suit exception applies here, the Court should enjoin Cheetah from prosecuting its '661 and '479 Asserted Claims in the Texas Action.  These claims are focused on Finisar's optical switches, and adjudication of these claims in Michigan,

11

particularly in light of Finisar's summary judgment of non-infringement proposed herein, would globally and quickly resolve them with respect to Finisar and all of its customers, and likely ahead of the Texas Action (March 2014 trial date).

2.     **The Court Should Allow Finisar to File a Summary Judgment Motion of Non-Infringement**

This entire case and Cheetah's claims against Finisar's customers in the Texas Action turn on the scope of Cheetah's patents-in-suit. Cheetah's view of the scope of its patents run counter to black-letter patent law, where the scope of a patent is limited by the "claims" set forth therein.

Claim construction is a question of law. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). It is often the case that a patent infringement action is disposed of entirely as a result of a court's construction of the asserted claims, without the need for any fact finding. See *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed. Cir. 2002) ("litigants frequently do not dispute the structure of the accused device, meaning the infringement analysis often turns on the interpretation of the claims alone"). In such cases, courts have found it efficient to combine summary judgment motions with claim construction. *See* Patent Case Management Judicial Guide (2009), §2.1.1.4 at 2-6 ("jurists have found that it is most effective and efficient to combine the [] set of summary judgment motions [that turn primarily or exclusively upon claim construction] with claim construction"); *My-Mail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378 (Fed. Cir. 2007) ("Because there is no dispute regarding the operation of the accused systems, that issue reduces to a question of claim interpretation and is amenable to summary judgment."); *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1356 (Fed. Cir. 2006) (affirming issuance of "carefully crafted summary judgment opinion," in which the district judge "construed two limitations of claim 1 of the patent" in lieu of a claim construction

12

order and "found as a matter of law that neither limitation was present in the accused shoes"). This is such a case.

The main thrust of the proposed motion is that the Court needs only to address two fairly simple and straightforward legal issues involving the construction of two limitations to Cheetah's patent claims – the phrase "cavity" in the '661 Patent and the phrase "variable blazed grating" in the VBG Patents – to dispose of this entire case altogether. Construing these limitations does not warrant any controversy: the phrase "cavity" is "expressly" defined in the specification of the '661 Patent, and the phrase "variable blazed grating," as used in the VBG Patents, which do not expressly define it, has an ordinary and customary meaning that is well-known in the art. In order for Cheetah to prevail, the "express" definition in the '661 Patent must be somehow ignored. In the VBG Patents, Cheetah must argue that the ordinary and customary meaning of the disputed phrase must be ignored. Both of the positions that Cheetah must take are not supported by the well-established claim construction framework set by the Federal Circuit. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc) ("[T]he specification 'acts as a dictionary when it expressly defines terms used in the claims ....'"); *CCS Fitness*, 288 F.3d at 1365 ("[s]ensibly enough, our precedents show that dictionary definitions may establish a claim term's ordinary meaning").

Once the proper constructions of these terms are adopted (and not simply ignored), Cheetah would have no basis to dispute that Finisar's optical switches lack the required "cavities" and "variable blazed gratings" and, therefore, cannot infringe the patents-in-suit, especially given Cheetah's close familiarity with Finisar's optical switches acquired in the course of discovery in the Verizon Action. Thus, the Court will be able to rule on the issue of non-infringement as a matter of law. *See Schoenhaus*, 440 F.3d at 1356; *see also Anderson v. Liberty*

13

*Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("the inquiry is whether the evidence … is so one-sided that one party must prevail as a matter of law").

### A.   Finisar's Optical Switches Do Not Infringe the '661 Asserted Claims Because They Lack a "Plurality of Cavities"

Each of the '661 Asserted Claims require a "plurality of cavities."  *See* '661 Patent, Claims 1-2, 6-7, 11, 15, 25-27, 29-31, 48-49, 50, 52 and 55.  In fact, the use of optical cavities in an optical device is the main feature of the invention claimed in the '661 Patent.  In the detailed description of the "Tunable Multiple Cavity Device," the specification of the '661 patent refers to the multiple cavities as "optical cavities," a common term of art, and expressly defines it as "the stratum between reflective stacks." *See id.* at Col. 4, ll. 56-57.  That is how the term "cavity" in the '661 Asserted Claims should be construed.  *See Phillips v. AWH Corp.*, 415 F.3d at 1321 ("[T]he specification 'acts as a dictionary when it expressly defines terms used in the claims ....'"); *see also* Swanson Decl. at ¶¶ 15, 23-6.

With this only proper construction for the term "cavities" in the '661 Asserted Claims, Cheetah's contentions of infringement against Finisar's optical switches must necessarily fail, because it is indisputable that Finisar's optical devices do not include the reflective stacks.  *See* Swanson Decl. at ¶¶ 16, 30-4.  Thus, Finisar's optical switches do not have the requisite "cavities." *See id.*  Nor do they have several of them, and therefore cannot infringe the '661 Asserted Claims also because they lack the requisite "plurality" of cavities.  *See id.*

### B.   Finisar's Optical Switches Do Not Infringe the VBG Patents Because They Lack a "Variable Blazed Grating"

Each of the '479 Asserted Claims and all claims of the '473 Patent require a "variable blazed grating." *See id.* at ¶ 37.  Even though the claims of the '502 Patent do not include this limitation verbatim, they include a combination of the following terms (with insignificant language variations in some claims) that are equivalent to "variable blazed grating": "a plurality

14

of at least partially reflective mirror strips," which are "operable to undergo a partial rotation" "resulting in a diffraction of the input optical signal wherein a majority of the diffracted input signal is communicated in one direction."  *See id.*

The disposition of Cheetah's contentions that Finisar's optical switches infringe any of the VBG Patents turns on the construction of the phrase "variable blazed grating."  This is a common term of art that is defined consistently in dictionaries and encyclopedias.[1]  *See id.* at ¶ 38-9.

The patentee did not attempt to redefine the term "grating" by providing a definition in the specification of the VBG Patents.  *See id.* at ¶ 38.  In fact, the specification of the VBG Patents fully supports the common use of this word in the field.  *See, e.g.,* '479 Patent, Col. 5, ll. 28-56, Figs. 1b, 2b; *see also* Swanson Decl. at ¶ 40.  Thus, a dictionary definition can be used to construe this term according to its common meaning.  *See CCS Fitness,* 288 F.3d at 1365 ("[s]ensibly enough, our precedents show that dictionary definitions may establish a claim term's ordinary meaning").

_____

[1] *See, e.g.,* Swanson Decl. (Exhibit H), The American Heritage® Dictionary of the English Language, Fourth Edition (2000) at http://www.thefreedictionary.com/grating and ttp://www.thefreedictionary.com/diffraction+grating ("**Grating** . . . 2. A diffraction grating"; "**Diffraction grating**: A usually glass or polished metal surface having a large number of very fine parallel grooves or slits and used to produce optical spectra by diffraction of reflected or transmitted light."); Collins English Dictionary – Complete and Unabridged © HarperCollins Publishers (2000) at http://www.thefreedictionary.com/grating and http://www.thefreedictionary.com/diffraction+grating ("**Grating** . . . 2. (Physics / General Physics) short for diffraction grating"; "**Diffraction grating**: (Physics / General Physics) a glass plate or a mirror with a large number of equidistant parallel lines or grooves on its surface. It causes diffraction of transmitted or reflected light, ultraviolet radiation, or X-rays"); McGraw-Hill Dictionary of Scientific & Technical Terms, Sixth Edition (2003) at http://www. thefreedictionary.com/diffraction+grating ("**Diffraction grating**: An optical device consisting of an assembly of narrow slits or grooves which produce a large number of beams that can interfere to produce spectra. **Also known as grating**."); McGraw-Hill Concise Encyclopedia of Physics (2002) at http://encyclopedia2.thefreedictionary.com/diffraction+grating ("**Diffraction grating**: An optical device consisting of an assembly of narrow slits or grooves, which by diffracting light produces a large number of beams which can interfere in such a way as to produce spectra.  Since the angles at which constructive interference patterns are produced by a **grating** depend on the lengths of the waves being diffracted, the waves of various lengths in a beam of light striking the **grating** will be separated into a number of spectra, produced in various orders of interference on either side of an undeviated central image. . . .").

Based on the manner in which the term "grating" is used throughout the specifications of the VBG Patents and the dictionary definitions of the word, Finisar proposes to construe the term "grating" as a "device having a large number of parallel grooves, slits or strips used to produce dispersed optical spectra by diffraction of light." *See, e.g.*, '479 Patent, Col. 5, ll. 28-56, Figs. 1b, 2b; *see also* Swanson Decl. at ¶¶ 17, 39-40. With respect to the "variable" and "blazed" limitations of the phrase "variable blazed grating," even though these concepts are somewhat more technical, they are well described in the VBG Patents, and are also consistent with their ordinary meaning, as one of ordinary skill in the art would understand them. *See, e.g.*, '479 Patent, Col. 5: 28-56, Figs. 1b, 2b; *see also* Swanson Decl. at ¶¶ 17, 35, 44. The term "blazed grating" refers to a specific type of grating, which is also commonly used in the art. As used in the VBG Patents, the term "blazed" grating refers to a grating that includes grooves, slits or strips that have been blazed at a "blaze angle." *See* Swanson Decl. at ¶¶ 17, 41. In addition, a "variable" blazed grating requires that a grating rotate its grooves, slits or strips to change the blaze angle. *See* Swanson Decl. at ¶¶ 17, 42.

With the phrase "variable blazed grating" properly construed, Cheetah cannot dispute that Finisar's optical switches do not infringe any of the VBG Patents because Finisar's optical switches do not include a grating that is "blazed" and also that is "variable," as taught by the VBG Patents, or include a surface with the requisite grooves, slits, or "reflective mirror strips." *See id.* at ¶ 44.

More specifically, the surface of Finisar's optical switches is perfectly flat, without any rotatable surface features with angles relative to the surface of the device. *See id.* at ¶ 44. Thus, Finisar's optical switches cannot be considered to include a "variable blazed grating" because they do not include a grating that is "blazed" and also that is "variable," as taught by the '479

16

and '473 Patents. *See id.* at ¶¶ 18, 45. For the same reasons, Finisar's optical switches do not include the limitations equivalent to "variable blazed grating" found in each claim of the '502 Patent (*i.e.*, "reflective mirror strips" "operable to undergo a partial rotation" "resulting in a diffraction of the input optical signal wherein a majority of the diffracted input signal is communicated in one direction"). *See id.* at ¶ 45. This absolute mismatch is explained by the simple fact that the function of Finisar's optical switches is fundamentally different from the function of the "variable blazed grating" claimed in the VGB Patents. *See id.* at ¶ 45. The function of Finisar's optical switches is not to form a diffraction pattern or provide diffraction, but rather to steer beams having a predetermined wavelength in specific predetermined directions. *See id.* at ¶ 45.

Therefore, any Cheetah's allegations of infringement of the VBG Patents against Finisar's optical switches are without any merit, and the Court is well justified to rule so as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Finisar respectfully requests that the Court enjoin Cheetah's co-pending claims of infringement of the '661 Asserted Claims and '479 Asserted Claims against Finisar's customers, and grant Finisar leave to file a motion for summary judgment of non-infringement.

DATED:  February 24, 2012                    Respectfully submitted,

                                             s/A. Michael Palizzi
                                             A. Michael Palizzi (P47262)
                                             MILLER, CANFIELD, PADDOCK & STONE, PLC
                                             150 W. Jefferson, Ste. 2500
                                             Detroit, MI  48226
                                             Telephone: (313) 963-6420
                                             palizzi@millercanfield.com

                                             s/David Radulescu
                                             David Radulescu
                                             davidradulescu@quinnemanuel.com
                                             Tigran Vardanian
                                             tigranvardanian@quinnemanuel.com
                                             QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                             51 Madison Avenue, 22nd Floor
                                             New York, NY  10010-1601
                                             (212) 849-7000

                                             *Attorneys for Plaintiff Finisar Corporation*


## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2012, I electronically
filed the foregoing document with the Clerk of the Court
using the ECF system which will send notification of such
filing to all counsel of record.

                                             s/A. Michael Palizzi
                                             A. Michael Palizzi (P47262)
                                             MILLER, CANFIELD, PADDOCK & STONE, PLC
                                             150 W. Jefferson, Ste. 2500
                                             Detroit, MI  48226
                                             Telephone: (313) 963-6420
                                             palizzi@millercanfield.com

18